UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                             Case No. 09-CR-245

SANTIAGO B. RIOS,

      Defendant.

## RECOMMENDATION ON DEFENDANT'S PRETRIAL MOTIONS

On October 6, 2009, a federal grand jury sitting in this district returned an indictment against Santiago B. Rios ("Rios"). Rios, having been previously convicted of a felony, is charged with one count of possessing ammunition which, prior to his possession of it, was transported in interstate and foreign commerce, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Rios was arraigned on October 13, 2009, and he entered a plea of not guilty to the above-mentioned charge. His trial is currently scheduled to commence on March 15, 2010, before Chief United States District Judge Charles N. Clevert. Currently pending before this court are the defendant's motion to suppress evidence and motion to suppress statements, which have been fully briefed and are ready for resolution. For the reasons that follow, it is recommended that the defendant's motions to suppress be denied.

### I. FACTUAL BACKGROUND

In July of 2009, the Racine Police Department received a tip from a confidential informant ("CI") that Rios was selling marijuana out of the upper unit of 1656 Dr. Martin Luther King Drive and that he personally observed a revolver in Rios's possession. The CI told police that, while at that location, Rios offered to sell him marijuana and that based upon his personal experience, he knows

Rios to have sold marijuana from that location. The CI also told officers that he knows Rios to be a member of the Boulevard Latin Kings street gang and that he observed Rios with a chrome .44 magnum revolver on several previous occasions.

Upon receiving the CI's information, Officer Kevin Kupper ("Kupper") took measures to confirm that Rios resided at the address provided by the CI. Kupper testified that a utility company inquiry revealed that the utilities for the entire upper unit were registered to Rebecca Dunkerly-Rios ("Ms. Rios"), who was confirmed to be Rios's wife. (Tr. at 38-39.) Kupper also testified that while conducting surveillance, police observed Rios enter the door marked "1656 UP," linking Rios to that residence. (Tr. at 26; Ex. 106.) Kupper further testified that before applying for a warrant, he asked other officers about their familiarity with the location. (Tr. at 39.) According to officers who had been in that same building for a completely unrelated incident a few years before the incident involving Rios, just one big unit comprised the second floor of 1656 Dr. Martin Luther King Drive. (Tr. at 39.)

Kupper also showed a Google Earth picture of 1656 Dr. Martin Luther King Drive to the CI. (Tr. at 25.) The CI confirmed the building as the one Rios was living in and selling marijuana from. The CI further indicated to Kupper that there was only one unit on the upper floor and that Rios occupied the entire upper unit. (Supplementary Incident Report, 7/30/09, at 1.) By pointing to the building's upper east facing windows on the Google Earth picture, the CI indicated that Rios was living in the front/east part of the building. (Tr. at 25.)

Based upon this information, Kupper applied for and obtained a no-knock search warrant from a Racine circuit court judge. (Tr. at 14-15.) The warrant described the place to be searched as follows:

> **1656 Dr. Martin Luther King Drive upper unit[] in the City and County of Racine, State of Wisconsin** described as a two story, multi unit dwelling,

2

>commercial lower and residential upper, brick construction, brown brick construction, with the numbers "1656 up" affixed directly above the southeast facing door, further that entry to the building will be made to the SOUTHEAST door located near the middle of the south wall of the structure.

(Search Warrant, July 27, 2009, at 1.) On July 29, 2009, Kupper briefed the Racine Police Department (RAPD) SWAT team, who then went to execute the search warrant in the early morning hours of that same day. (Tr. at 48.) At approximately 5:15 a.m. on July 29, 2009, twelve SWAT team members entered the southeast facing door marked "1656 UP" with a battering ram. (Tr. at 42-43.) The SWAT team proceeded up the stairs and thereafter used the battering ram on another door that was located at the top of the stairwell. (Tr. at 43.) Once inside, the officer threw a diversionary device into the hallway. (Tr. at 43.)[1]

Once the diversionary device was utilized, the officers entered the hallway and discovered multiple doors, including one labeled "Apt #1," one labeled "aPT #2," and one that led to a bathroom. (Tr. at 50; Exs. 1-2.) Based upon the information provided by the CI, officers breached the east facing door (apartment #1) with a battering ram. (Tr. at 50-51.) SWAT Officer David Derks ("Derks") testified that, once inside apartment #1, he perceived an individual later identified as John Clark ("Clark") in the bedroom. Derks then looked around and observed pictures of African-American individuals on the wall. Knowing that Rios is Hispanic, he began to think that officers may have entered the wrong apartment or that there was another portion to the flat. (Tr. at 46, 51-52.)

Officers then exited apartment #1 and observed another door that faced west. (Tr. at 46.) Derks testified that he heard movement on the other side of that door. (Tr. at 46.) The movement,

---

[1] The diversionary device that was used makes a "loud boom" noise and dispenses a bright light, which has the potential to "disorient individuals in the residence for a split second to give [officers] the element of surprise." (Tr. at 44.)

3

combined with the use of the sound and light diversionary device as well as the fact that officers were yelling "Police, Search Warrant as [they] hit the steps," led officers to be concerned about the destruction of evidence as well as officer safety. (Tr. at 46-47.) At that point, Derks knocked on the door to apartment #2, and Ms. Rios answered the door. (Tr. at 46.) According to Derks, he had a handgun with him, but he did not have it drawn when he knocked on the door. (Tr. at 53.) Ms. Rios testified, however, that Derks held a long-barreled rifle in his hand when she opened the door. (Tr. at 91, 98.) After Ms. Rios opened the door, Derks asked who she was in the apartment with, and she indicated that she was there with her husband and kids. (Tr. at 46.) Derks testified that he then saw Rios looking from around the corner, at which point officers asked him to show his hands, placed him in handcuffs, and secured the premises. (Tr. at 47-48.)

Kupper then sought to obtain another warrant for "**1656 Dr. Martin Luther King Drive rear upper unit #2[] in the City and County of Racine, State of Wisconsin**." (Search Warrant, July 29, 2009, at 1.) The description of the building remained the same as in the first warrant. From this moment forward, testimony about what happened diverges. Officers testified that, while Kupper was applying for the second search warrant, they did not search Rios's apartment until Kupper returned to the premises, approximately one and a half hours later, and handed the warrant to Sergeant Todd Schulz ("Schulz"), who then read the warrant to Rios and his wife and advised Rios of his Miranda rights. (Tr. at 34, 47-48, 66-67, 70-71.)[2] However, Ms. Rios testified that she heard officers searching the back room of the house (she testified that she heard "papers falling") and saw officers searching their kitchen cupboards and their garbage located in the kitchen. (Tr. at 92-93.) Rios

---

[2] Schulz's police report omits any facts about Schulz having read Rios his Miranda rights. Nor did Rios sign a form for notification of waiver rights. Rather Schulz testified that Rios verbally indicated that he understood his rights after Schulz read him his rights from a Miranda card.

4

testified that he also heard officers searching his apartment before the second search warrant arrived. (Tr. at 105.)

While waiting for the second search warrant, Schulz called Jose Rios, Rios's brother, and Melissa Rodriguez, Jose's girlfriend, to come to the apartment and pick up Rios's children. (Tr. at 69, 81.) Both Jose Rios and Melissa Rodriguez testified that, upon arriving at Rios's residence, they heard officers searching the common hallway bathroom. (Tr. at 84, 86.) Finally, according to Rios and his wife, officers asked Rios questions before the second warrant arrived. Ms. Rios testified that officers asked Rios the following: "What do you have in your house? We know you have something in your house." (Tr. at 97.) Rios testified that Schulz stated to Rios that there was something in the house, guns and marijuana specifically. (Tr. at 106-07.) To the officers alleged questions, Rios and Ms. Rios responded by saying that there was nothing in their apartment. (Tr. at 97, 106.) Schulz testified, on the other hand, that officers did not question Rios or make any statements that would be reasonably likely to elicit an incriminating response before he read the second search warrant to Rios and advised Rios of his Miranda rights. (Tr. at 74.)

## II. ANALYSIS

Rios offers several interrelated arguments in favor of his motions to suppress: (1) the initial warrant was invalid because it did not describe the place to be searched with particularity; (2) officers entered his apartment without a warrant, without consent, and without exigent circumstances, and the good faith exception is not applicable in this case; (3) the second warrant is also defective and therefore does not save the illegal entry and search of his apartment; (4) officers searched his apartment before the second warrant arrived at the scene; and (5) officers interrogated him without first providing Miranda warnings. The court will address each argument in turn.

**A. Particularity**

The Fourth Amendment requires that a search warrant contain a description of the particular place to be searched and the things to be seized. "The particularity requirement is satisfied if 'the description is such that the officers with a search warrant can with reasonable effort ascertain and identify the place intended.'" *United States v. Nafzger*, 965 F.2d 213, 215 (7th Cir. 1992) (quoting *Steele v. United States*, 267 U.S. 498, 503 (1925)). "Where a warrant fails to describe with particularity the place to be searched, it is void." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (citing *Horton v. California*, 496 U.S. 128, 139-40 (1990)). That having been said, "'the validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty [to] discover and to disclose, to the issuing Magistrate.'" *Id.* (quoting *Maryland v. Garrison*, 480 U.S. 79, 85 (1987)).

The particularity requirement serves the vital function of preventing unauthorized invasions in the sanctity of a person's home and preventing the police from indiscriminately rummaging through his property. *See United States v. Jones*, 54 F.3d 1285, 1289-90 (7th Cir. 1995). "As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." *Id.* at 1290 (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

When a search involves a building with multiple, separate units, the warrant must specify the precise unit that is the subject of the search to satisfy the particularity requirement. *United States v. White*, 416 F.3d 634, 637 (7th Cir. 2005) (citing *Jacobs*, 215 F.3d at 767; *United States v. Hinton*, 219 F.2d 324, 326 (7th Cir. 1955)). Nothwithstanding the above, a mistakenly overbroad warrant is invalid only if the officers, in light of information available at the time the warrant issued, knew or should have known the true character of the dwelling. *See Garrison*, 480 U.S. at 85. In other

words, "the validity of a warrant must be judged on the basis of the information available at the time that the warrant issued." *White*, 416 F.3d at 637-38 (citing *Garrison*, 480 U.S. at 85).

To demonstrate, in *Garrison*, police obtained a warrant for the third floor of a three-level residential building, under the mistaken belief that the floor designated in the warrant contained only one apartment. *See Garrison*, 480 U.S. at 81. In making this determination, the police relied on an informant, an exterior examination of the building, and a utility company inquiry. *See id.* When police executed the search warrant, police discovered that there were two apartments on the third floor. *Id.* Rather than invalidating the warrant, the Court examined what the officers knew or should have known and found that the investigation produced a reasonable belief that there was only one tenant. *See id.* at 85, 86 n.10. Because the officers did not and should not have been expected to know that there were two separate dwellings on the floor to be searched, the Court concluded that the warrant was valid based on the information that the officers disclosed and had a duty to disclose to the issuing judge. *See id.* at 85-86.

Here, the original warrant authorized a search for "1656 Dr. Martin Luther King Drive upper unit." It is undisputed that there were two units on the upper, second floor of the building. Therefore, the original warrant was overbroad for failing to specify the precise unit that is the subject of the search. That the warrant was overbroad does not mean that it should necessarily be invalidated, however. Rather, under *Garrison*, the next question becomes whether the police knew or should have known, based on the available information at the time the warrant issued, that the second floor of the building contained multiple units.

In light of all of the information readily available, police reasonably believed that 1656 Dr. Martin Luther King Drive upper unit was a single-family residence and that Rios was the only tenant on that floor. The exterior of the building does not let on that there are two units on the second floor.

7

Although there are two mail boxes (each displaying the respective tenant's name), both mailboxes are located inside of the first door and are barely visible from the exterior of the building. Moreover, there appears to be only one working doorbell on the exterior of the building. Below the working doorbell is the plate of an old doorbell, which constitutes unclear indicia of the number of units contained on the second floor. Because the second floor had a common entrance and the officers had not been inside recently, they would not have seen the numbers written on the doors or the separate locks on the door.

Moreover, Kupper's efforts to confirm Rios resided at 1656 Dr. Martin Luther King Drive were reasonable and did not reveal that there were two units on the upper floor. Kupper testified that two or three years ago, officers who were inside the building for a completely separate incident involving different individuals, informed him that there was only one large unit on the second floor. Kupper also checked to see in whose name the gas and electricity were registered. This inquiry indicated that the only billing party for the upper floor of this building was Ms. Rios. Like in *Garrison*, at the time the warrant issued, police did not know or should not have known that the upper floor was comprised of two units. Therefore, the original warrant was valid based on the information that the officers disclosed and had a duty to disclose to the issuing judge

Notwithstanding the validity of the warrant, the *Garrison* Court instructed that police are to discontinue a search upon discovering that there are multiple units on the floor. *See Garrison*, 480 U.S. at 87. Upon discovering the multiple units, officers are "put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." *Id.* Here, it is unclear at which point officers discovered that there were two units on the upper floor. While the common hallway presented multiple doors to the officers, Derks testified that once he encountered an African-American individual in apartment #1, he had a "feeling [that they] were in the wrong apartment or

8

there was another portion to this upper flat." (Tr. at 46:2-4.) It was at that point that Derks returned to the common hallway and observed a door to the west of the one SWAT officers entered. (Tr. at 46.) Though it is unclear at which precise moment the SWAT team discovered the multiple units, one thing is clear: SWAT officers discovered that there were multiple units on the second floor before they entered Rios's residence. It is uncontested that police knocked on apartment #2 and then entered Rios's residence without consent and prior to obtaining the second search warrant.

**B. Exigent Circumstances**

Absent consent or probable cause and exigent circumstances, the Fourth Amendment prohibits entering a house without a warrant. *See Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*, 445 U.S. 573, 586-87 (1980). Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, safety of law enforcement officers, or safety of the general public. *See United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006) (citing *United States v. Richard*, 994 F.2d 244, 247-48 (5th Cir. 1993)). Exigent circumstances also exist when "the police have an objective and reasonable fear that evidence is about to be destroyed." *United States v. Marshall,* 157 F.3d 477, 482 (7th Cir.1998) (quoting *United States v. Napue,* 834 F.2d 1311, 1326 (7th Cir.1987)). The question is whether "'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *Id.* at 482 (quoting *United States v. de Soto,* 885 F.2d 354, 367 (7th Cir.1989)).

Rios argues that the officers' entry into his residence was not justified by exigent circumstances. According to Rios, "sounds of movement from within a home are not exigent circumstances," the officers "had no personal knowledge that any evidence would be destroyed," and there was "no fear for [officer] safety present." (Def.'s Br. at 7-8.) Moreover, the defendant argues

9

that a warrantless entry was not reasonable because the "government cannot justify a warrantless search on the basis of exigent circumstances of which the government creates itself." (Def.'s Br. at 9.)

Looking at the totality of the circumstances, I am satisfied that exigent circumstances existed. First, as will be discussed later, probable cause to believe that illegal drugs would be located in apartment #2 was present in this case. Second, a great amount of commotion was caused during the SWAT team entry. A battering ram was used to gain entry through three doors, SWAT officers announced their presence at the time of entry, and a sound and light diversionary device was also used in the common hallway. To be sure, Rios testified that he heard "a loud flash, bang, boom, and [he] heard people yelling, Police, Police, Police," indicating that he was, indeed, aware that something out of the ordinary was occurring. (Tr. at 102: 21-22.) Officer Derks testified that officers heard movement in apartment #2, (Tr. at 46), confirming that the commotion did wake and stir the residents of apartment #2. Because of the highly destructible nature of controlled substances, it was reasonable for the officers to believe that any evidence may be destroyed before they could secure another warrant. Moreover, "proof of actual knowledge that evidence is being destroyed or removed" is not required. *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir. 1974).

An exception to exigent circumstances, however, exists when law enforcement officers "manufacture an emergency and then use the emergency to justify dispensing" with the warrant requirement. *See United States v. Collins*, 510 F.3d 697, 700 (7th Cir. 2007). In assessing whether police impermissibly create exigent circumstances, courts are to "appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *Rosselli*, 506 F.2d at 630; *see also Coles*, 437 F.3d at 370 ("we are guided by the principle that in order to determine whether the police impermissibly manufacture or

create exigent circumstances, we must look to the reasonableness and propriety of their actions and investigative tactics *preceding* their warrantless entry"); *United States v. Chambers*, 395 F.3d 563, 566 (6th Cir. 2005) (same); *Richard*, 994 F.2d at 248-49 (same); *United States v. Duchi*, 906 F.2d 1278, 1284 (8th Cir. 1990) (same). Part of this analysis involves a inquiry into whether there is an indication that the target of the investigation was aware of any surveillance prior to an officer's decision to gain entry.

For example, in *Collins* the court, in holding that evidence should have been suppressed after a warrantless search, found that there was no reason to think that anyone in the house that was searched knew that the police were approaching before "[the officers] arrived at [the defendant's] door." *See* 510 F.3d at 700. Similarly, in *Napue* the court highlighted the fact that the district court did not find that "the officers had a reasonable basis for believing that anyone in the room would have known of [the defendant's] arrest in the hall on the other side of the closed door and therefore might have destroyed evidence." *See* 834 F.2d at 1327.

In contrast, as previously discussed, the defendant was aware of the agents' presence before Derks knocked on the door to his residence. Thus, the facts of the instant case are materially different than the facts in *United States v. Munoz-Guerra*, 788 F.2d 295 (5th Cir. 1986), upon which the defendant relies in support of his argument. In *Munoz-Guerra*, the court found that "it was possible to secure the condominium [wherein officers observed marijuana in plain view through a window] covertly from the outside." *Id.* at 298. In suppressing the evidence, the court stated that "without reason to believe that a criminal suspect was aware of police surveillance, the mere presence of firearms or destructible, incriminating evidence does not create exigent circumstances." *Id.* Because officers had a reasonable basis to believe individuals in apartment #2 knew officers were on the other

11

side of the closed door, this case is distinguishable from those cases, including *Collins, Napue,* and *Munoz-Guerra*, where police officers announced their presence by knocking on the door.

Moreover, the "manufacturing" metaphor is predicated on whether officers deliberately and improperly or impermissibly created the circumstances. *See Coles*, 437 U.S. at 366, 366 n.9; *see also United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002). Here, the record does not reflect any evidence suggesting that officers deliberately and improperly created or manufactured the exigency. The officers, in good faith, obtained a warrant for the upper unit, believing that there was only one unit on the upper floor. The officers' entry into the second floor common area was legal because they carried a warrant for those premises, and thus, the officers had a right to be in the hall corridor of the upper unit. Upon learning that there were multiple units on the upper floor, they had a right to simply knock on the door to the defendant's residence, which is precisely what they did. The officers did not neglect to obtain a warrant for apartment #2, further evincing good faith. *See id.* at 488-89 (finding that police did not create exigency by getting a warrant, in good faith, for wrong area of the property).

Finally, the decision to enter with a SWAT team armed with a battering ram was triggered by a reasonable *perception* that the danger posed to executing officers was elevated due to their knowledge of Rios's pattern of violent behavior and gang involvement. In hindsight, I cannot say that such decision was made in bad faith. Thus, the record lacks any evidence of bad faith or deliberate misconduct on the part of the officers.

For the foregoing reasons, Rios has not persuaded me that the exigent circumstances were created by the officers themselves, thereby rendering their entry unreasonable.

**C. Second Search Warrant**

Rios next contends that the second warrant issued was not supported by probable cause because the CI's reliability was undermined by the discovery of multiple units on the upper floor of the building as well as the location of Rios's residence in the building, which turned out to be the rear/west portion of the building, rather than the front/east portion of the building. Specifically, Rios states as follows:

> The affidavit in support of the second search warrant was exactly the same as the affidavit in support of the first search warrant, except for the addition of paragraph 36 which explained that officers had entered the wrong apartment. The first search warrant was obtained based solely on information from a confidential informant. Once, the first search warrant had been executed on apartment #1, it was abundantly clear that the information provided by the CI was incorrect.

(Def.'s Br. at 10-11.) The government, on the other hand, argues that even though the first warrant described the place to be searched with sufficient particularity, the officers "opted to take the cautious approach" by freezing the apartment, and going "back to the judge to clarify the address. This was unnecessary, but certainly demonstrates their good faith." (Gov't's Br. at 9.)

My duty in reviewing this search warrant is limited. The duty of a reviewing court is simply to ensure that the judge issuing the search warrant had a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. Probable cause exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990), *overruled on other grounds by United States v. Nance*, 236 F.3d 820 (7th Cir. 2000), *as recognized in United States v. Westmoreland*, 240 F. 618 (7th Cir. 2001). "Probable cause denotes more than mere suspicion, but does not require certainty." *United States v. Fleischli*, 305 F.3d 643, 651 (7th Cir. 2002) (internal quotations omitted), *superseded by*

13

*statute,* Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, *as recognized in Untied States v. Griffith*, 334 F.3d 714 (7th Cir. 2003). "'In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Kimberlin*, 805 F.2d 210, 228 (7th Cir. 1986) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Probable cause is a fluid concept, turning on the assessment of probabilities in a particular factual context. "Rather than viewing bits and pieces of a probable cause showing in isolation, the court must focus on all the facts presented to the magistrate." *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir. 1993). A search warrant may issue "even in the absence of 'direct evidence linking criminal objects to a particular site.'" *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). "The [judicial officer] to whom the warrant application is directed 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense,' and the [judicial officer] 'need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.'" *Id.* (quoting *United States v. Malin*, 908 F.2d 163, 166 (7th Cir. 1990)).

In reviewing prior probable cause findings made by a judicial officer in issuing a warrant, "great deference" is to be accorded to that determination. *See Leon*, 468 U.S. at 914; *see also United States v. Pless*, 982 F.2d 1118, 1124 (7th Cir. 1992) (stating that "doubtful cases are to be resolved in favor of upholding the warrant"). The Seventh Circuit Court of Appeals has held that the standard of review of a determination that probable cause exists supporting issuance of a search warrant is "one of affirmance absent clear error by the issuing magistrate." *See Pless*, 982 F.2d at 1124. Indeed, "[a judge's] determination of probable cause 'is to be given considerable weight and should

be overruled only when the supporting affidavit, read as a whole in a realistic and common sense manner, does not allege specific facts and circumstances from which the magistrate could reasonably conclude that the items sought to be seized are associated with the crime and located in the place indicated.'" *United States v. Newsom*, 402 F.3d 780, 782 (7th Cir. 2005) (quoting *United States v. Spry*, 190 F.3d 829, 835 (7th Cir. 1999)).

Where, as here, the affidavit submitted in support of the search warrant relies on information supplied by an informant, the totality of the circumstances inquiry generally focuses on the informant's reliability, veracity, basis of knowledge, and credibility. *See United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005); *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009). This inquiry rests on several factors, including: (1) the degree of police corroboration of the informant's statements; (2) the extent to which the information is based on the informant's personal observations; (3) the amount of detail provided; (4) the interval of time between the events and the application for the search warrant; and (5) whether the informant personally appeared before the warrant-issuing judge to present the affidavit or testimony. *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002). "No one factor is dispositve, so a deficiency in some areas can be compensated by a strong showing in others." *Bell*, 585 F.3d at 1049 (citing *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006)).

The affidavit in support of the second warrant establishes that the CI's information was current and based upon personal observation. The CI also provided Kupper with a fair amount of detail. The CI told Kupper that he had personal knowledge of Rios and that he met Rios at 1656 Dr. Martin Luther King Drive, upper unit, for a drug transaction. Once inside Rios's residence, the CI told Kupper that on July 18, 2009, there was a gun in plain view on the living room table, that Rios stored marijuana in his bedroom, and that Rios "produced a blue Aeropastle [sic] plastic bag

containing approximately one-half of a pound of marijuana." (Aff. ¶ 4.) The CI also stated that Rios offered to sell the CI one ounce of marijuana for $100 while inside Rios's residence. Based on the CI's personal experience, he knew that Rios possessed a chrome .44 magnum revolver, and that he observed Rios with the same revolver on several previous occasions.

While the level of detail provided by the CI was adequate, it was also slightly amiss. It is uncontested that the CI told Kupper that Rios occupied the entire upper floor and that Rios was living in the front/east part of the building—information that was later discovered to be incorrect.

I am satisfied, however, that the CI's mis-identification regarding the precise location of Rios's residence within the upper floor does not render the warrant invalid. The degree of police corroboration in the case at bar made the information provided by the CI more reliable. Police had the CI identify Rios's residence. Police conducted surveillance that tied Rios to the second floor of 1656 Dr. Martin Luther King Drive. Police located the utility bill for the upper floor of 1656 Dr. Martin Luther King Drive and discovered that utilities for the entire upper floor were listed to Ms. Rios, who police confirmed to be Rios's wife. Finally, after knocking on the door to apartment #2, the officers observed Rios inside, corroborating the CI's statements.

Although Rios maintains that the CI's information regarding the location of Rios's residence was wrong, thereby undermining the validity of the warrant, who is to say that the drug transaction between Rios and the CI did not occur in the front/east portion of the upper unit? After all, the utilities for the entire upper unit were listed to Ms. Rios. Or, perhaps the CI was wrong because he mistakenly pointed to the wrong apartment on a Google Earth picture of Rios's residence, like the government contends. Notwithstanding the above, the fact that Rios lived and sold drugs to the CI out of the upper floor of the building remained the same from the time of the application for the first search warrant to the time of the application for the second search warrant. Indeed, what changed

16

during this time frame was the discovery of multiple units and the presence of Rios in apartment #2, which was denoted in paragraph 36 of the revised affidavit. It was upon entering the second floor that officers realized there were two apartments, and they, in good faith, sought another search warrant. Although the CI did not personally appear before the warrant-issuing judge to present the affidavit or testimony, the CI did subject himself to prosecution for making false statements to law enforcement regarding Rios. Considering the totality of the circumstances and giving deference to the judge who issued the warrant, I am persuaded that the affidavit presented in support of the issuance of the search warrant for 1656 Dr. Martin Luther King Drive, rear upper apartment #2 sets forth probable cause to believe that contraband or other evidence of a crime would be found at that residence.

However, even if I were to conclude that the second search warrant for Rios's residence was not supported by probable cause, I would nevertheless find that the seized evidence is admissible under the good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). Under *Leon*, an affidavit is sufficient to establish probable cause if the police relied on the warrant in good faith. "An officer's decision to seek a warrant is prima facie evidence that the officer was acting in good faith." *United States v. Dismuke*, No. 08-1693, slip op. at 6 (7th Cir. Jan. 27, 2010) (citing *United States v. Watts*, 535 F.3d 650, 657 (7th Cir. 2008)). Thus, the good faith exception applies unless the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" or the warrant-issuing judge "wholly abandoned" her neutral judicial role and "serve[d] merely as a rubber stamp for the police." *Leon*, 468 U.S. at 914, 923.

In a case like this one, suppression of the fruits of the search would not be appropriate. First, the affidavit is not so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the

17

warrant. *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002). Nor is there any evidence to suggest that the warrant-issuing judge abandoned her neutral judicial role.

**D. The Search**

To reiterate, the moment after the SWAT team crossed the threshold into Rios's residence is where the parties' factual assertions diverge. Rios argues that the officers entered and began searching his residence prior to the arrival of the second search warrant. According to Ms. Rios, she heard papers falling from her desk and saw the officers open her kitchen cabinets and look into the kitchen garbage. According to Rios's brother and his brother's girlfriend (who came to pick up Rios's children), officers were searching the bathroom that opens to the common hallway. According to the testifying officers, no search took place until after the arrival of the second warrant.

First, even if officers searched the bathroom that opens to the common hallway before the arrival of the second search warrant, no Fourth Amendment violation occurred because the record does not contain evidence suggesting that Rios had any reasonable expectation of privacy in that bathroom. Because the bathroom door opened to the common hallway, it appears to be a common area, accessible by individuals other than Rios and his family, such as Clark. Given the record before the court, no illegal search occurred, if any search of the bathroom occurred at all.

With respect to the search of Rios's apartment, I cannot say that all seized evidence should be suppressed. This is for two reasons. First, the record does not establish where in the apartment the evidence was found. If officers, indeed, searched prior to the arrival of the second warrant, and if they did not observe or seize any evidence during that search, there would be no illegally seized evidence. Second, even if officers did illegally seize evidence before the second warrant arrived, the court need not resolve the factual dispute because the evidence would have been inevitably discovered once said warrant arrived at the scene. The inevitable discovery doctrine holds that even

an illegally seized item need not be suppressed if the government can prove by a preponderance of the evidence that the officers would have discovered it by lawful means. *See Nix v. Williams*, 467 U.S. 431, 444 (1984); *see also United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009). Because the second warrant was valid, any evidence that would have been seized during an unlawful search would have been discovered by lawful means.

In conclusion, and for all of the foregoing reasons, it will be recommended that Rios's motion to suppress evidence be **DENIED**.

### E. Oral Statements

Finally, Rios argues that any and all of his statements allegedly made to officers before his Miranda rights were read to him must be suppressed. That said, because I find Schulz's testimony that officers did not subject Rios to any custodial interrogation to be credible, Rios's argument falls short. I find Schulz's testimony credible because it was straightforward and given without hesitation. Because no interrogation occurred prior to the arrival of the second warrant, Miranda warnings were not required at that time and any incriminating statements made by Rios during that time period were not in response to interrogation and therefore are admissible. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

In conclusion, and for all of the foregoing reasons, it will be recommended that Rios's motion to suppress statements be **DENIED**.

**NOW THEREFORE IT IS RECOMMENDED** that Rios's motion to suppress evidence be **DENIED**;

**IT IS FURTHER RECOMMENDED** that Rios's motion to suppress statements be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), and Federal Rule of Criminal Procedure 59(b)(2) (as amended effective December 1, 2009), whereby written objections to any recommendation herein or part thereof may be filed within fourteen days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal.

**SO ORDERED** this 12th day of February 2010 at Milwaukee, Wisconsin.

                          **BY THE COURT:**

                          s/ William E. Callahan, Jr.
                          WILLIAM E. CALLAHAN, JR.
                          United States Magistrate Judge